Meyer, J.
(dissenting). I dissent. The majority’s conclusion is contrary to the plain meaning of the controlling statute and its legislative history, and contrary to the rationale in Kurcsics v Merchants Mut. Ins. Co. (49 NY2d 451), Matter of Zeitlin v New York City Conciliation & Appeals Bd. (46 NY2d 992), and Axelrod v Starr (41 NY2d 942).
The class B housing unit here in issue was subject to the rent control law (Administrative Code of City of New York, tit Y) until its first vacancy after the effective date of the 1971 Vacancy Decontrol Law (L 1971, ch 371). On that date the unit became “decontrolled”. Thereafter, in 1974, the Legislature enacted the Emergency Tenant Protection Act (EPTA) (L 1974, ch 576, § 4). That statute in subdivision a of section 3 authorized the city, upon the declaration by the city council that there existed a state of housing emergency, to extend coverage of the 1969 Rent Stabilization Law (Administrative Code, tit YY) to: “[A] 11 or any class or classes of housing accommodations heretofore destabilized; heretofore or hereafter decontrolled, exempt, not subject to control, or exempted from regulation and control under the provisions of the emergency housing rent control law, the local emergency housing rent control act or the New York city rent stabilization law of nineteen hundred sixty-nine.” The same statute (L 1974, ch 576), section 4 of which enacted the EPTA, in section 7 amended the Rent Stabilization Law to give effect to the expanded coverage,[1] when and if an emergency were declared, by adding to section YY51-3.0 a new subdivision b making the Rent Stabilization Law applicable to “other housing accommodations made subject to this law pursuant to the emergency tenant protection act of nineteen seventy-four.”
The city council acting under the authority thus granted to it thereafter adopted Resolution No. 276 of 1974. That resolution made the requisite declaration of emergency and *82 then imposed “the full degree of regulation and tenant protection authorized or established by [the Emergency Tenant Protection Act].” Indeed, tracking the language of the enabling statute (EPTA, § 4, subd [a]), the resolution imposed rent stabilization upon: “[A] 11 classes of housing accommodations within the City of New York including, but not limited to, housing accommodations heretofore destabilized, heretofore or hereafter decontrolled, exempt, not subject to control, or exempted from regulations and control under the provisions of the local Emergency Housing Rent Control Law or the City Rent Stabilization Law.”
The inescapable conclusion is that class B multiple dwellings became subject, by reason of Resolution No. 276 and the enabling act pursuant to which it was adopted, to the Rent Stabilization Law, for it clearly was, within the meaning of both, a “housing accommodation * * * heretofore * * * decontrolled.” The majority apparently does not dispute this conclusion, but argues, rather, that the Legislature (and the city council) cannot really have meant what the plain meaning of the words used and action taken clearly says because that would render subdivision a a nullity[2] by including within its embrace housing units expressly or implicitly excluded from it. That argument is, however, answered by our decision in Axelrod v Starr (41 NY2d 942, supra). In that case we affirmed “on the opinions by Mr. Justice Nathaniel T. Helman at Special Term and Mr. Justice Samuel J. Silverman at the Appellate Division (52 AD2d 232).” That the same argument here made as to class B dwellings was there made and overuled as to dwelling units financed by a public agency is clear from the following portion of Justice Silverman’s opinion (52 AD2d, at p 234):
“Plaintiffs contend that their properties are exempt by reason of the exception contained in clause (a) of paragraph (1) of subdivision a quoted above; and that the *83 provision of subdivision b making the law applicable to ‘other housing accommodations made subject to this law pursuant to the emergency tenant protection act of nineteen seventy-four’ refers only to ‘other’ housing accommodations, other than those exempted by subdivision a. Defendants city agencies contend that subdivision b makes the law applicable to ‘other,’ in the sense of ‘additional,’ accommodations, additional to those' covered by subdivision a and specifically including those exempted from subdivision a.
“I think the defendants’ interpretation is correct.”
The reasoning upon which that conclusion was based is spelled out at pages 234 to 236 of the Appellate Division opinion and need not be repeated here. It is sufficient simply to note that by affirming on the Silverman opinion we adopted an interpretation contrary to that now espoused by the majority.
Nor can Matter of Zeitlin v New York City Conciliation & Appeals Bd. (46 NY2d 992, supra) be disposed of as facilely as the majority seeks to in its footnote 9. In Zeitlin a tenant used two rooms of his nine-room rent-controlled apartment for business purposes. As a result, the apartment became “decontrolled” for as long as he continued this professional use. Nonetheless, we held that the decontrol of the apartment, even though temporary, brought the apartment within the broad scope of the Emergency Tenant Protection Act in that the apartment had been exempted from coverage under prior legislation. We established a straightforward formula for determining rent stabilization applicability: (1) Is the unit a housing accommodation? (2) Was the unit excluded from regulation under prior law? If the answer to both questions is yes, we concluded, then rent stabilization applies (46 NY2d, at p 995). Since our decision in Zeitlin both the Appellate Term (Mandel v Pitkowsky, 102 Misc 2d 478) and the Civil Court (Post v Reynolds, 101 Mise, 2d 504) have followed its reasoning in concluding, respectively, that loft accommodations used residentially and class B multiple dwellings are subject to control.[3] Since as to the unit involved in this *84 appeal the answer to both of Zeitlin’s questions is in the affirmative, the order of the Appellate Division should be reversed on Zeitlin alone.
Finally, in its reference to the code of the Rent Stabilization Association (p 78), the majority opinion seeks support from statutory construction rules concerning the practical construction given by the agencies charged with enforcement and the failure of the State or city to take action to upset a construction thus made (p 78). The answers are several. First, the city did in Axelrod oppose the construction which the code and the majority now give to subdivision b. Secondly, the suggestion wholly ignores our recent statement in Kurcsics v Merchants Mut. Ins. Co. (49 NY2d 451, 459, supra) that: “Where * * * the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency and its interpretive regulations are therefore to be accorded much less weight. And, of course, if the regulation runs counter to the clear wording of a statutory provision, it should not be accorded any weight.” (Emphasis supplied.) Thirdly, if we agree for purposes of argument that the failure of the city, through its Housing Development Administration, to contest the Rent Stabilization Association’s erroneous construction could alter the city council’s legislative intent to extend rent stabilization to class B multiple dwellings, there is little other than the code, the product of an association the membership of which consists exclusively of interested property owners, to guide us to that conclusion. To find in legislative inaction the adoption of a conclusion diametrically opposed to the original legislative intent is “ ‘at best treacherous’ ” (Boys Markets v Clerks Union, 398 US 235, 241), the more so when judicial construction has accorded with the original intent and the plain meaning of the words, and what is to be acted against is an administrative construction that “runs counter to the clear wording” of the statute (Kurcsics, supra).
*85 The order of the Appellate Division should be reversed.
Judges Jasen, Jones, and Wachtler concur with Judge Fuchsberg; Judge Meyer dissents and votes to reverse in a separate opinion in which Chief Judge Cooke and Judge Gabrielli concur.
Order affirmed, with costs.

. Amendment by the Legislature rather than the council was necessary because the council had been left powerless by the “Urstadt Law” (L 1971, ch 372), which prohibited the city from imposing any additional regulation on unregulated housing units.

. The “nullity” argument is, in any event, specious because, as the majority recognizes (p 76), section 5 of the Emergency Tenant Protection Act contains a long list of housing accommodations that remain beyond the reach of subdivision b.

. The statement in Minton v Domb (63 AD2d 36, 39), quoted by the majority, is clearly, as it relates to class B dwellings, obiter, since Minton involved *84 not a class B dwelling but a co-operative apartment. As such, and since it is contrary to both Axelrod and Zeitlin, the dictum should not be accorded the controlling weight the majority gives it.